AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Kansas

FILED
U.S. District Court
District of Kansas

JUN 22 2016

Clerk, U.S. District Court
By: CCaeke Deputy Clerk

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH<br>"shanesmith52.ss@gmail.com"<br>THAT IS STORED AT PREMISES CONTROLLED BY<br>GOOGLE, INC. as further described in Attachment A. | ) ) ) ) ) ) ) | Case No. 16- M- 6083-01-KGG |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ____Northern____ District of ____California____ *(identify the person or describe property to be searched and give its location)*:

See ATTACHMENT A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of __18__ U.S.C. § __2241, 2243__, and the application is based on these facts:
__2251, 2252, 2252A, and 1512__

See Affidavit.

☑ Continued on the attached sheet. (see attached affidavit of probable cause)
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

J. Reese Popst, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6-22-2016

*Judge's signature*

City and state: Wichita, KS

Kenneth G. Gale, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS



IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
"shanesmith52.ss@gmail.com"
THAT IS STORED AT PREMISES
CONTROLLED BY GOOGLE INC., 1600
AMPHITHEATRE PARKWAY, MOUNTAIN
VIEW, CA 94043

Case No. 16-M-6083-01-KGG

## AFFIDAVIT

I, J. Reese Popst, being duly sworn, depose and state:

### INTRODUCTION

1. I am employed as a Special Agent with the Federal Bureau of Investigation (FBI). I have been employed as a Special Agent since February 18, 2016. I am currently assigned to the Wichita, Kansas, Resident Agency, Kansas City Division. Prior to service with the FBI, I was a Certified Public Accountant working in public accounting specializing in financial audit. As a Special Agent of the FBI, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with authority to execute arrest, search, and seizure warrants under the authority of the United States. I have participated in a variety of criminal investigations, to include crimes against children, white collar crimes, and various non-violent Federal crimes.

2. I make this affidavit in support of an application for a search warrant for information located in or associated with a certain internet storage and e-mail account, **shanesmith52.ss@gmail.com**, that is stored at premises owned, maintained, controlled, or

1

operated by Google, an email and internet file storage provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

3. The information in this affidavit is information known to me as a result of my participation in this investigation or is information that has been communicated to me by other law enforcement investigators and witnesses, involved in this investigation. Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only those facts that I believe are necessary to establish the existence of probable cause to support a search warrant to search for and seize instrumentalities, fruits and evidence of violations of:

- a. Title 18, United States Code, Section 2241(a), relating to aggravated sexual abuse committed by use of force;

- b. Title 18, United States Code, Section 2241(c), relating to aggravated sexual abuse of a child between the ages of 12 and 16, committed by use of force;

- c. Title 18, United States Code, Section 2243(a), relating to engaging in sexual acts with a minor between the ages of 12 and 16;

- d. Title 18, United States Code, Section 2251, relating to the production of child pornography;

- e. Title 18, United States Code, Section 2252 and 2252A, relating to the distribution, transportation, receipt, and possession of child pornography; and

- f. Title 18, United States Code, Section 1512, relating to tampering with a witness or victim;

which may be located in the **shanesmith52.ss@gmail.com** e-mail account or its associated Google Drive account.

**LOCATION TO BE SEARCHED**

4. The location to be searched is the premises controlled by Google Inc., headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043, for information associated with the email and internet storage account **shanesmith52.ss@gmail.com**, known to be used by the Random Shane Smith, the subject of the investigation. Google is the internet storage provider

2

and e-mail service provider for this account and they maintain this account on their servers for use by their customers.

## AUTHORITY

5. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, Inc., to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the account, including the contents of communications.

6. The government may use a search warrant to obtain subscriber information and records, including the contents of the subscriber's account(s). 18 U.S.C. § 2703(a), (b)(1)(A), (c)(1)(A). Unlike traditional Federal Rule of Criminal Procedure (Rule 41) warrants, warrants issued pursuant to section 2703 may be used to compel records held in another district, so long as the warrant is issued by a court with jurisdiction over the criminal offense under investigation.

7. Affiant asserts this Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, this Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

   a. In this case, and as will be articulated below, certain criminal acts occurred on McConnell Air Force Base (relating to violations of 18 U.S.C. §§ 2241(a), 2241(c), 2243(a), 2251, 2252 and 2252A). McConnell Air Force Base (MCAFB) is a United States military base located in Wichita, Kansas. The base includes residential housing for military personnel and their families.

   b. Pursuant to 18 U.S.C. 7(3), this Court has jurisdiction over the offenses (listed in the preceding subparagraph) that may have occurred on MCAFB, including within the residential housing, as such is part of the territorial jurisdiction of the United States.

   c. Pursuant to 18 U.S.C. 1512(i), this Court has jurisdiction over the § 1512 offense(s), as such conduct was intended to affect an official proceeding in this district.

3

8. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

9. Also, pursuant to Title 18, United States Code, Section 2703(b)(1)(A), where such a warrant is obtained, no notice to the subscriber or customer is required to be given.

## DETAILS OF INVESTIGATION

10. This information set forth below is providing an overview of the investigation conducted to date. It does not include a listing of all investigative techniques employed or even the full and complete results of any of the listed investigative efforts.

11. In October of 2015, Minor Victim 1 (hereinafter, MV1), born in January 1998 (17 years old on this date), reported to her mother that Random Shane Smith (SUBJECT), born in September 1979, had been sexually abusing her and her twin sister, Minor Victim 2 (MV2) repeatedly over the last six years. MV2 later confirmed MV1's disclosure.

12. Mother of MV1 and MV2 (VICTIMS' MOTHER) was a current United States Army Sergeant stationed at MCAFB, living on-base in residential housing with MV1 and MV2.

13. Within 24 hours of the initial report, the mother of MV1 and MV2 transported them to live with their maternal grandparents in Mendota, Illinois. VICTIMS' MOTHER told the grandparents about the allegations, but advised she did not believe them because SUBJECT was impotent and unable to have intercourse. VICTIMS' MOTHER did not report the sexual abuse allegations to law enforcement, either on-base or off-base.

14. While residing at the grandparents' residence in Mendota, MV2 received intimidating email messages from jones_shawn72@yahoo.com. MV2 knew this email account to be a fictitious/alias account used by SUBJECT.

15. While residing at the grandparents' residence, both MV1 and MV2 disclosed details relating to their sexual abuse by SUBJECT to their grandparents.

16. On February 29, 2016, the grandparents reported the sexual abuse of MV1 and MV2 by SUBJECT to Mendota Police Department (MPD). The grandmother reported that MV1 told her that the abuse began as inappropriate touching and petting by SUBJECT, beginning prior to July of 2009, when SUBJECT had access to MV1 in Maryland. The grandmother reported that both girls told her that, since their arrival to MCAFB, SUBJECT has repeatedly subjected them to sexual intercourse.

17. The grandmother also provided MPD with a copy of two emails that MV2 received on February 17, 2016 from jones_shawn72@yahoo.com. MV2 told the grandmother that SUBJECT told MV2, prior to her being taken to Illinois, that he would use a fake email address to communicate with MV2. These messages stated:

   a. "That's why u don't talk to me and what your slut ass was doing. Fucking around with some guy. God I hate you more than anything. Don't bother coming back I never want to see you or hear from you again. Hope you and ur sister both fucking die."

   b. "I fucking hate you more than anything just fucking die."

18. MPD officer Jason Stewart contacted AFOSI at MCAFB to report the crimes, as the sexual abuse occurred on-base at MCAFB.

19. On March 1, 2016, AFOSI Agents Pingree and Inness sent a preservation letter to Yahoo! regarding the jones_shawn72@yahoo.com email account.

20. On March 17, 2016, AFOSI Agents Pingree and Inness interviewed MV1 and MV2 in Mendota, Illinois. Both MV1 and MV2 confirmed and provided additional details regarding SUBJECT's sexual abuse of the minor victims at MCAFB as well as at other locations, including (but not limited to):

    a.    Both girls were afraid of SUBJECT, because of his strength, physical size and military training.

    b.    For MV1, the sexual abuse began in Maryland in 2009, where SUBJECT would kiss and lick MV1. The sexual abuse continued when MV1 moved to North Carolina, where SUBJECT forced MV1 to perform sex acts on him. In North Carolina, SUBJECT began subjecting MV1 to penetrative sexual acts. When MV1 moved to MCAFB in January 2014, SUBJECT continued to force MV1 to perform sex acts upon, or with, SUBJECT.

    c.    For MV2, in Maryland, she heard SUBJECT trying to persuade MV1 to perform oral sex on him, but did not confront SUBJECT. The sexual abuse of MV2 began later, in North Carolina, where SUBJECT would use his fingers to touch MV2's genitals while she slept. When MV2 moved to MCAFB in January 2014, SUBJECT continued to sexually abuse MV2, forcing her to perform oral sex while holding and moving her head and subjecting MV2 to penetrative sexual acts.

    d.    The sex acts perpetrated by SUBJECT while in Kansas occurred on-base at the residence of MV1 and MV2.

21. During the interview by AFOSI, MV1 also disclosed that SUBJECT took nude pictures of her genitals, as well as pictures while he engaged in sexual acts with her. She reported he used his cell phone to do this, and that the pictures were taken inside MV1's residence on MCAFB.

22. During the interview by AFOSI, MV2 identified the email address jones_shawn72@yahoo.com as an email address used by SUBJECT to communicate with MV2 without other family members (her grandmother) being aware of the communication.

23. MV1 also stated SUBJECT created a fictitious online account to communicate with her sister, MV2, so that others would not know that Subject was in contact with MV2. MV1 identified SUBJECT as using the fictitious account to discuss the sexual acts performed in the past with both minor victims.

24. Both MV1 and MV2 reported SUBJECT used Facebook to find out information about them.

25. Based upon their reports of moving to MCAFB in January 2014 and the continued sexual abuse upon arrival at MCAFB, both MV1 and MV2 were more than 12 but less than 16 years old at the time SUBJECT engaged in sexual acts. SUBJECT was more than 4 years older than both girls at all times.

26. On May 11, 2016, VICTIMS' MOTHER was interviewed by the affiant and AFOSI Agent Pingree at the AFOSI office at MCAFB. She confirmed the presence of sex toys in the home located on MCAFB in Wichita, Kansas, and provided additional details regarding her and SUBJECT'S sex life, his purported impotence, and MV1 and MV2's disclosure of SUBJECT's abuse, including (but not limited to):

   a. SUBJECT was impotent due to muscle relaxers and pain medication he was taking due to an injury purportedly received during his service in the military.
   b. SUBJECT utilized a penis pump for help maintaining sexual excitement with very little success.
   c. SUBJECT was unwilling to see a medical doctor regarding his impotence.
   d. Although SUBJECT uses muscle relaxers which make him unable to maintain sexual arousal, SUBJECT routinely goes to the gym to do weight training as he is a body builder.

27. On May 11, 2016, SUBJECT was interviewed by the affiant and AFOSI Agent Jared Pingree at the AFOSI office at MCAFB. SUBJECT confirmed the presence of sex toys, and provided additional details regarding his sex life and his purported impotence, including (but not limited to):

   a. SUBJECT utilized a penis pump and a penis ring in the past to maintain sexual arousal with VICTIM'S MOTHER due to his impotence from taking muscle relaxers and pain medication.
   b. SUBJECT also used over the counter medications to help increase sexual excitement with little effect.
   c. Since MV1 and MV2 moved away from MCAFB in October 2015, his sex life with VICTIM's MOTHER has increased in frequency to approximately once a week.
   d. SUBJECT described his sex life with VICTIMS' MOTHER as "gets the job done."

  e. When asked where he had sex in the house (where MV1 and MV2 had resided), SUBJECT declared the master bedroom was the only location within the home he ever had sex.
  f. When challenged with information that bodily fluids had been located elsewhere, SUBJECT then declared he and VICTIMS' MOTHER had sex in a reclining chair in the living room once. Further, SUBJECT claimed he masturbated in his reclining chair in the living room and in the bathroom, but that was all.
  g. Later in the conversation, when he was challenged with information that bodily fluids had been located on the mattresses in the room belonging to MV1 and MV2, SUBJECT stated he became lonely when MV1 and MV2 moved away from Wichita, Kansas, and would watch pornographic movies and masturbate while sitting on MV1 and MV2's beds.
  h. Later, when challenged with information regarding bodily fluid found on clothing owned by MV1 and MV2, SUBJECT stated he used the clothing to clean up after himself subsequent to masturbating on their beds.

28. SUBJECT's statements indicate his belief that his seminal fluid should be found in several locations that had been previously described by MV1 and MV2 as locations where SUBJECT sexually abused them.

29. Pursuant to search warrant on May 11, 2016, law enforcement located and seized sex toys and implements from 3036 S. Westover Drive, Wichita. These sex toys and implements were similar to those previously described by MV1 and MV2.

30. On May 18, 2016, SUBJECT's cellular telephone, which was seized pursuant to a search warrant on May 11, 2016, was analyzed using Cellebrite technology at the Heart of America Regional Computer Forensics Laboratory in Kansas City, Missouri. The analysis revealed all of the following and not limited to:

  a. Multiple images of child pornography depicting teenage and prepubescent females with their genitals displayed in the images.
  b. Multiple images of child erotica depicting images of teenage and prepubescent females, with clothing, posing in erotic poses.
  c. Multiple websites saved as bookmarks for pornography depicting nude teenage and prepubescent females.
  d. Approximately 200 images were deleted from the cell phone on March 1, 2016, one day after the initial police report was filed with Mendota Police department. Contained within the meta-data of these deleted files (information saved by computer and Smartphone software regarding the

8

        origination of files) was information that the cell phone accessed the images from Google Drive Account **shanesmith52.ss@gmail.com**.
   e. Approximately 9 websites, specifically depicting pornographic images teenage or prepubescent females, bookmarked in the internet search history of the phone, utilized the Google Drive Account **shanesmith52.ss@gmail.com** as the source of reference for the website.
   f. Approximately 4 websites, specifically related to pornography, showing capability of users uploading their own images, were bookmarked in the internet search history of the cell phone.

31. On May 20, 2016, the affiant sent a preservation letter to Google regarding account **shanesmith52.ss@gmail.com**.

## BACKGROUND RELATED TO GOOGLE ACCOUNTS AND GOOGLE DRIVE

32. In consultation with other agents and in my experience, I have learned the following relative to Internet-based e-mail service providers (ESPs) and other internet based mobile and desktop applications ("apps"):

   a. Google is a United States company that produces internet based products such as Gmail (email service), Google Drive (internet based cloud storage), Google Search, Google Play, Google Plus, Google Maps, and YouTube, all of which can be used by either Microsoft or Apple desktop operating systems, for use on cellular telephones, Smarthphones, tablets, desktop, and laptop computers. These services can be accessed from devices that have internet connection capability via web browsers or mobile and desktop apps. As described in further detail below, the services include email, instant messaging, and file storage:
      i. Gmail is an email service provided by Google to its users through email addresses at the domain name gmail.com. further, users are able to instant message one another and communicate in real-time while using Gmail through a feature known as Gchat.
      ii. Google Drive is a file hosting, storage, and sharing service provided by Google. Google Drive can be utilized through numerous Google connected services and can also be used to store data associated with third-party apps.
      iii. Google Drive services allow users to create, store, access, share, and synchronize data on any internet-connected device. This information is saved online by users and saved in computer servers maintained by Google.
      iv. Google Drive can be used to store photographs, drawings, recordings, videos, and other documents. For example, Google Drive enables a user to access pictures and videos on multiple devices. Google Drive can be used

9

|  |  |  |
|---|---|---|
|  |  | to store and manage pictures and videos taken from Smartphone devices such as Apple iPhones or other Android software based Smartphones. |
|  | v. | Google Drive provides users with 15 gigabytes of free electronic online storage space, and users can purchase additional storage. |
|  | vi. | Google Search is a search engine that allows users to search the internet for files, images, documents, articles, etc. |
|  | vii. | Google Play is a social gaming network that allows users of Google apps to play and share games with each other. |
|  | viii. | Google Plus is a social media platform used to connect users of Google through online message posting, file sharing, and online communicating. |
|  | ix. | Google Maps is an application that allows users to geographically locate selected sites. |
|  | x. | YouTube is a video sharing platform that enables users to upload, download, and watch videos posted by themselves or others. |
| b. |  | Google services are accessed through the use of a "Google Account," an account created by the user utilizing internet access to Google's website. A single Google account can be linked to multiple Google services and devices, serving as a central authentication and syncing mechanism. |
| c. |  | A Google Account takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit a Google provided email address, ending in @gmail.com or a third party email provider (such as Yahoo, Hotmail, or Apple products). The Google Account can be used to access most Google services only after the user access and responds to a "verification email" sent by Google to that "primary" email address. |
| d. |  | During the registration process, these ESPs ask subscribers to provide basic personal information. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). However, the ESPs typically do not independently verify the information provided by the subscribers. Some ESPs require secondary contact information, such as an alternate e-mail address or telephone number, to confirm that the subscriber is in fact a human user or to provide additional security features for the account, such as a text notification to a phone number when logging into the account from a new device or computer. This holds true for Google, the provider in this case. |
| e. |  | Generally, ESPs keep and maintain the account registration information, including the information entered by the subscriber, the Internet Protocol address (IP address) used at the time of registration, the date of the account's creation and length of service, and associated secondary/security accounts. ESPs also retain certain transactional information about the use of each account on their systems, including records of log-in (i.e., session) times and durations and the associated IP address for each log-in, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via an associated website), and other log files that reflect usage of the account. Yahoo!, the provider in this case, retains this type of information. |

  f. In some cases, subscribers will communicate directly with the ESP about issues relating to the subscriber's account, such as technical problems, billing inquiries, or complaints about (or from) other users. ESPs typically retains records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or subscriber as a result of the communications. This holds true for Google, the provider in this case.

  g. With regard to e-mail, when the subscriber sends an e-mail, it is initiated at the subscriber's computer, transferred via the Internet to the ESP's servers, and then transmitted to its end destination. The ESP often saves a copy of the e-mail, either as a "draft" message, a "sent message," or as a message pending delivery. Unless the sender of the e-mail specifically deletes the e-mail, the e-mail can remain on the ESP's server indefinitely. This holds true for Google, the provider in this case.

  h. Likewise, an e-mail that is sent to a subscriber will be stored in the subscriber's "mail box" on the ESP's respective servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on the ESP's servers indefinitely. This holds true for Google, the provider in this case.

  i. Aside from the content of a message, a "sent" or "received" e-mail typically includes the source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. A "draft" email may include similar information. This holds true for Google, the provider in this case.

  j. Typically, ESP subscribers can also store files, including e-mails, contact lists, calendar data, pictures, and other files, on servers maintained and/or owned by the ESP. Again, this holds true for Google, the provider in this case. The full list of services available to Google subscribers is listed at https://www.google.com/intl/en/about/products/.

33. In my training and experience, "user attribution evidence" or evidence of who was using an e-mail account or other online service, such as Google Drive, at a given time may be found several sources associated with the account.

34. For example, email providers typically log the IP addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information is important, as it may tend to either inculpate or exculpate the subscriber for the account.

11

35. Aside from log-in information, other sources of "user attribution" evidence may include the account registration information, secondary email accounts, telephone numbers, contact or address books, credit card information, bookmarks, and email content, including the attachments to e-mails (such as pictures or documents).

36. For example, while the registration information may reveal evidence associated with a particular individual when the account was created (such as a phone number), the actual email content shows the continued usage by the same individual (such as signature lines in an email, or a photo attachments bearing time/date information, or a receipt for a purchase associated with the individual's credit card). This is particularly true for a storage account associated with an email account, where the email account may reveal more information related to the user identification.

37. Likewise, content stored in the user's account may provide details identifying the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent or stored as an attachment to an email, such as GPS metadata or the physical surroundings depicted).

38. Thus, information obtained from these various components of an online storage account can provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

39. Put another way, "user attribution" evidence reflects the "indicia of occupancy" that would be sought during the execution of a search warrant at a physical residence.

40. Review of the content may also provide relevant insight into the account user's state of mind as it relates to the offense under investigation. For example, information in the online stoarge account may indicate the owner's motive and intent to commit a crime (e.g.,

communications relating to the crime), or consciousness of guilt (e.g., deleting communications or saved images in an effort to conceal them from law enforcement).

## BACKGROUND RELATED TO PROVIDER'S RESPONSES

41.   When served with a search warrant for electronic communications, a provider, such as Google, will send the contents of the specified account to the investigating agency, usually on a CD or DVD, for the investigator to review.

42.   The information provided reflects a snapshot of the account at a particular moment in time. In this regard, as to the contents, the ESP only provides what is located within the account at the time of the preservation letter or search warrant. In this regard, the "entire" account reflects only what has been left on the ESPs servers at a particular moment in time – **it may not, and likely is not, the entire account containing every email or file since the account's creation**. In this regard, a request for a "date range" of content would be conceptually inaccurate and confusing.

43.   The ESP can copy the contents of the account because that is within their expertise. Though the provider affirms that the records relate to the specified account, the provider does not and will not undertake the examination of the contents of an account to make a determination as to what is relevant or irrelevant to the investigation, or to determine what may or may not be privileged information. Generally, and in this case particularly, the provider is not familiar with the investigation and is not in a position to identify the victim(s) or subject(s) of the investigation.

44.   The ESP is neither qualified nor trained to search the account as would a law enforcement officer. Only a trained agent, familiar with the facts of the case can determine what

items should or should not be seized. An untrained ESP employee is likely to seize too much to avoid any suggestion that 1) s/he has interfered with a legitimate law enforcement investigation or 2) has defied a court order. For these reasons, your Affiant requests the provider reproduce the records listed in Section 1 of Attachment B, for the email account listed in Attachment A.

45. Because the nature of the criminal venture involves avoiding detection, it is typical for individuals to use code in communications, to mislabel attachments, or to otherwise disguise communications about the criminal venture. As noted above, evidence of who was using the target account may be found in a variety of locations. These include: actual e-mail correspondence or files in the account, because the content will sometimes include reference to names, either in salutations, signatures, or in the message content itself; attachments to e-mails, including pictures and files, because the content of those may include identifiers such as self-portrait or depicting other physical identifiers, or textual references that include names or addresses, such as an invoice or receipt; address books, contact or buddy lists, because these may show familial contacts or other associates who can identify the user of the email account. Sometimes, an email or file that appears unrelated on its face (such as a receipt for an internet purchase) provides information (such as a name or credit card number) that identifies the user of the account. For these reasons, the law enforcement investigator must be allowed to review all of the contents of the account, for the evidence listed in Section 2 of Attachment B. This is particularly true where the account itself appears to have been created solely for engaging in criminal conduct, as in this case.

## BACKGROUND ON CHILD PORNOGRAPHY OFFENDERS

46. Based on my training and from consultation with other agents experienced in Child Pornography investigations, I know that offenders who have a sexual interest in children

frequently collect, trade, and store depictions of child engaged in sexual acts, i.e., child pornography.

47. Additionally, individuals who produce child pornography will frequently distribute or trade images that they have produced. Sometimes, this is done with other offenders, either in exchange for other child pornography, or for access to larger on-line communities of sexual offenders. Sometimes, the produced images are used to entice other minors into producing additional child pornography. In almost all cases, however, the producer retains copies of the images for their own sexual gratification.

48. Because of the perceived security and anonymity of Internet-based accounts, as well as their relatively immediate accessibility via a variety of mobile devices, some child pornography producers maintain their collections in on-line storage or in email accounts. This allows them to avoid detection by family members or friends who would not have access to a password-protected account. The evidence of images being deleted from a seized cellular phone belonging to **SUBJECT** demonstrates an intention to avoid detection.

49. In this case, the **SUBJECT** has engaged in activities consistent with this type of offender behavior. He has used a cellphone device, as well as fictitious email accounts, in the course of the production of child pornography.

## CONCLUSION

50. Based on the foregoing, your Affiant believes that a historical search images and videos uploaded, downloaded, shared, and deleted, as well as attachments to these e-mails, in the Google Drive account **shanesmith52.ss@gmail.com**, from the date of creation until the present, will divulge information that is likely to show evidence of violations of:

    a.    Title 18, United States Code, Section 2241(a), relating to aggravated sexual abuse committed by use of force;

    b.    Title 18, United States Code, Section 2241(c), relating to aggravated sexual abuse of a child between the ages of 12 and 16, committed by use of force;

    c.    Title 18, United States Code, Section 2243(a), relating to engaging in sexual acts with a minor between the ages of 12 and 16;

    d.    Title 18, United States Code, Section 2251, relating to the production of child pornography;

    e.    Title 18, United States Code, Section 2252 and 2252A, relating to the distribution, transportation, receipt, or possession of child pornography; and

    f.    Title 18, United States Code, Section 1512, relating to tampering with a witness or victim.

51.    Your affiant further asserts that there is probable cause to believe that such evidence is located on the computer systems of Google Inc., located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, within the e-mail account of **shanesmith52.ss@gmail.com**.

52.    Wherefore by this affidavit and application, your affiant request that the Court issue a search warrant which would allow agents to seize the e-mail and other information stored on the Google Inc. system for the account identified in this affidavit, as further described in Attachments A and B.

_____
J. Reese Popst
Special Agent, FBI

Subscribed and Sworn before me this 22 day of June, 2016.

_____
The Honorable Kenneth G. Gale
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
## (Google, Inc.)

### LOCATION TO BE SEARCHED

This warrant applies to information associated with the following e-mail and Google Drive account:

    **shanesmith52.ss@gmail.com**

that is stored at premises owned, maintained, controlled, or operated by **Google, Inc.**, a company headquartered at **1600 Amphitheatre Parkway, Mountain View, CA 94043**.

## ATTACHMENT B
## (Google, Inc.)

### ITEMS TO BE SEIZED

I. **Information to be disclosed by Google, Inc.:**

To the extent that the information described in the affidavit is within the possession, custody, or control of **Google, Inc., Google, Inc.** is required to disclose the following information to the government for each account or identifier listed in Attachment A:

- a. All records or other information regarding the identification of the account subscriber, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

- b. All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

- c. The contents of all e-mails stored in the account, including copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

- d. The contents of the associated Google Drive account, including all files uploaded, downloaded, or shared by the account;

- e. All transactional information, including internet protocol address log files, dates, times, methods of connecting, ports, dial ups, and/or locations;

- d. Copies of the Terms of Service or User Agreement in effect at the time of the account registration, along with records of the subscriber's acceptance or declination of subsequent Terms or Agreements.

II. **Information to Be Seized By the Government:**

All information described above in Section I that constitutes contraband, fruits, evidence and instrumentalities of violations of Title 18, United States Code §§ 1512, 2241(a), 2241(c),

2243(a), 2251, 2252, and 2252A, including, for the account or identifier listed on Attachment A ("Location to Be Searched"), information pertaining to the following matters:

    a.    Data or content tending to show the user of the account, including but not limited to subscriber information, IP logs, alternative/secondary email or telephone number contacts, address books, friend-lists or buddy-lists, headers, salutations, and email content referencing the user or other identifier information such as names, nicknames, credit card numbers, phone numbers, self-portraits, or physical addresses;

    b.    Data or content related to social networking profiles or alternate accounts which may have been used to contact, or view information associated with, MV1 and MV2;

    c.    Data or content related to the production, receipt, possession, or distribution of child pornography;

    d.    Data or content constituting child pornography (depicting minors engaged in sexual explicit conduct) or child erotica;

    e.    Data or content relating to communications about child pornography and depictions of minors, or otherwise involving a sexual interest in minors;

    f.    Data or content relating to communications with or about minors or individuals pretending to be minors;

    g.    Data or content relating to influencing, harassing, intimidating, or threatening MV1 or MV2.

    h.    Data or content identifying other accounts used or accessed by Random Shane Smith.